**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. _25-cv-681_____ |
| v. | **JURY TRIAL DEMANDED** |
| RAMIL VENTURA PALAFOX, | |
| Defendant, | |
| and | |
| BBMR THRESHOLD LLC, DARVIE MENDOZA, MARISSA MENDOZA PALAFOX, and LINDA VENTURA, | |
| Relief Defendants. | |

**COMPLAINT**

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows for its Complaint against Defendant Ramil Ventura Palafox ("RV Palafox" or "Defendant") and Relief Defendants BBMR Threshold LLC, Darvie Mendoza, Marissa Mendoza Palafox, and Linda Ventura (the "Relief Defendants"):

**SUMMARY**

1.      From in or about January 2020 through in or about October 2021 (the "Relevant Period"), RV Palafox orchestrated an international securities fraud scheme to misappropriate millions of dollars of investor funds he obtained through Praetorian Group International Corporation ("PGI Global"), a now-defunct entity he controlled.

1

2.     PGI Global claimed to be a crypto asset and foreign exchange ("Forex") trading company.  RV Palafox and PGI Global associates working at his direction represented to investors that PGI Global was generating large returns from crypto asset trading and Forex trading.  Investors who purchased PGI Global "membership packages" were promised large passive returns from these purported trading operations.  Though investors were promised such returns merely in exchange for their investments in PGI Global, the company also offered members a multi-level marketing style system of referral incentives to encourage PGI Global membership package holders to recruit new investors.

3.     RV Palafox secured over $198 million in Bitcoin (BTC) and fiat currency investments for PGI Global during the Relevant Period.  He obtained these funds from victims who purchased PGI Global membership packages based on false promises that their investments would guarantee them large low-risk returns from Forex and crypto asset trading.

4.     RV Palafox misappropriated over $57 million of the funds he obtained through PGI Global's unregistered securities offerings.  Rather than trade with these funds as promised, he used investor money to enrich himself and various insiders including members of his family and certain other PGI Global associates—purchasing, among other things, real estate, Lamborghinis, and items from retailers including Cartier, Versace, and Louis Vuitton.  RV Palafox also transferred funds, assets, vehicles, and other items purchased with PGI Global investor funds to the Relief Defendants.

5.     RV Palafox meanwhile used the vast majority of the remaining PGI Global investor funds to pay certain other investors—payments that ostensibly represented profits and other rewards those investors had earned from PGI Global's trading operations.  In fact, this money represented funds circulated from new investors to old investors.  These lulling payments allowed RV Palafox to continue PGI Global's Ponzi-like scheme until its collapse in late 2021.

6.      PGI Global never filed a registration statement in connection with its offerings of securities in the form of PGI Global membership packages.  RV Palafox and others nevertheless offered and sold these PGI Global securities via general solicitations to investors worldwide.

## VIOLATIONS AND RELIEF SOUGHT

7.      RV Palafox violated, and unless enjoined will continue to violate, Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), (c), and 77q(a)], as well as Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8.      More broadly, RV Palafox will engage again in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object unless he is restrained and enjoined.

9.      The Commission seeks: to permanently enjoin RV Palafox from violating the federal securities laws again; to permanently enjoin him from participating in certain marketing and sales programs and from participating in the issuance, purchase, offer or sale of securities except for his own personal accounts, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 78t(b)] and Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and (d)(5)]; disgorgement of ill-gotten gains derived from RV Palafox's unlawful activity, with prejudgment interest, pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and (d)(7)]; and civil monetary penalties against RV Palafox pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].  The Commission also seeks disgorgement, with prejudgment interest, of Relief Defendants' ill-gotten gains by which they were unjustly enriched, pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and (d)(7)]; and other relief the Court may deem just and appropriate.

**JURISDICTION AND VENUE**

10.     The Court has jurisdiction over this action pursuant to Sections 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d)(1) and 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

11.     The Court has personal jurisdiction over RV Palafox.  Certain of the acts and transactions constituting violations of the Securities Act and Exchange Act alleged in this Complaint occurred in the Eastern District of Virginia, including the PGI Global promotional event described below.  At least one PGI Global investor harmed by RV Palafox's conduct also resided in the Eastern District of Virginia during the Relevant Period.

12.     Venue is proper in the Eastern District of Virginia under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].  Transactions, acts, practices and courses of conduct constituting violations of the federal securities laws alleged in this Complaint occurred within this District, including offers and sales of securities in the city of Alexandria, Virginia.

13.     RV Palafox made use of the means or instruments of transportation and communication in interstate commerce in connection with the conduct the Commission alleges in this Complaint. Among other things, RV Palafox used email messages, text messaging programs, social media platforms, telephones, the mails, and bank wires to perpetrate his investment scheme.

**DEFENDANT**

14.     Ramil Ventura Palafox, age 59, resided in Las Vegas, Nevada and Porter Ranch, California during the Relevant Period.  On information and belief, he is presently a resident of California. RV Palafox was the founder, president, and chief executive officer of PGI Global.

**RELIEF DEFENDANTS**

15.     BBMR Threshold LLC ("BBMR") is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.  Corporate records list two of RV Palafox's

relatives, who also worked for PGI Global during the Relevant Period, as BBMR's co-managers. RV Palafox directed BBMR's co-managers and thus used BBMR to hold and transfer assets that had been purchased for his own and his family's benefit with misappropriated PGI Global investor funds, and to receive proceeds of sales of such assets. BBMR had no legitimate claim to such assets purchased with PGI Global investor funds, nor did it have a legitimate claim to the proceeds of the sales of such assets.

16.     Marissa Mendoza Palafox, age 58, resides in Las Vegas, Nevada and Porter Ranch, California. Marissa Palafox, who is married to RV Palafox, received funds and/or items of value and assets derived from PGI Global investor funds from RV Palafox and/or at the direction of RV Palafox during the Relevant Period. Through her access to accounts she held jointly with RV Palafox, Marissa Palafox also benefitted from investor funds RV Palafox had misappropriated and redirected to those accounts. Marissa Palafox had no legitimate claim to any PGI Global investor funds, or to any items or assets purchased with such funds.

17.     Darvie Mendoza, age 54, resides in Granada Hills, California. He is RV Palafox's brother-in-law. Darvie Mendoza received transfers of funds derived from PGI Global investor deposits during the Relevant Period. These included a $320,212 payment toward Darvie Mendoza's home mortgage. Darvie Mendoza had no legitimate claim to the PGI Global investor funds he received.

18.     Linda Ventura, age 78, resides in Las Vegas, Nevada. She received funds and items of value from RV Palafox and Marissa Palafox including over $169,252 to pay off her mortgage, and a Range Rover vehicle. These funds and items of value were derived from or purchased with PGI Global investor funds to which Linda Ventura had no legitimate claim.

### OTHER RELEVANT ENTITY

19.     Praetorian Group International Corporation was a Nevada corporation with its principal place of business in Las Vegas, Nevada. PGI Global purported to be a Forex and crypto asset trading

5

company prior to its dissolution on or about September 20, 2021. RV Palafox controlled PGI Global throughout the Relevant Period.

## OTHER RELEVANT INDIVIDUALS

20.     Associate 1, a relative of RV Palafox, worked in PGI Global's office in Nevada during the Relevant Period. At RV Palafox's direction, Associate 1 handled investor funds and transferred PGI Global funds and/or assets purchased with PGI Global funds to certain other entities and individuals including various PGI Global associates and Relief Defendant BBMR. Associate 1 was also a co-manager of Relief Defendant BBMR.

21.     Associate 2, a relative of RV Palafox, worked in various roles for PGI Global during the Relevant Period. At RV Palafox's direction, Associate 2 handled investor funds, made payments and/or transferred BTC to certain investors, and activated investors' PGI Global membership packages. Associate 2 was also a co-manager of Relief Defendant BBMR.

## FACTS

### RV Palafox Launches the PGI Global Scheme

22.     RV Palafox had previously participated in multi-level marketing businesses before he launched PGI Global in or about January 2020.

23.     From its inception, and through the Relevant Period, RV Palafox controlled and directed all material aspects of PGI Global. He conceived and delivered PGI Global messaging used to recruit prospective investors, shared information with actual investors, and exercised control over PGI Global's uses of investor funds including in determining whether and to what extent investors could withdraw their funds from PGI Global.

24.     In launching PGI Global, RV Palafox recruited promoters with experience both in multi-level marketing and the solicitation of investments in crypto assets. RV Palafox and PGI Global associates working at his direction described PGI Global to investors as a financial company

successfully using blockchain technology to trade crypto assets. PGI Global promised guaranteed returns to its membership package holders as well as bonuses for recruiting new investors.

25.    RV Palafox and promoters working for him solicited investments in PGI Global in a variety of ways: at in-person promotional events, via social media sites on the Internet, on real-time communication platforms such as Zoom, and through email, telephone, and text-message communications.

26.    For example, with RV Palafox's approval and/or at RV Palafox's direction, PGI Global held a promotional event for prospective investors on or about June 26, 2021, at a hotel in Alexandria, Virginia, within the Eastern District of Virginia, at which PGI Global associates offered or sold PGI Global securities.

27.    RV Palafox and PGI Global promoters working at RV Palafox's direction eventually solicited millions of dollars in investments from individuals in the United States and around the world.

### RV Palafox's Misrepresentations to Investors

28.    RV Palafox and promoters working at his direction made material misrepresentations to investors throughout the Relevant Period regarding PGI Global's operations, RV Palafox's background, and the status of investors' funds.

29.    RV Palafox and promoters working at his direction represented to investors that RV Palafox had expertise in the crypto asset industry.

30.    RV Palafox and promoters working at his direction represented to investors that PGI Global had a team of traders generating revenue for the company, including a purported trading team based in the Philippines.

31.    PGI Global materials provided to investors also suggested that the company had developed an "Auto Trading" platform to trade crypto assets using artificial intelligence.

32.    RV Palafox and promoters working at his direction represented to investors that PGI Global was licensed to trade crypto assets in the Philippines and Estonia.

33.    Throughout the Relevant Period, RV Palafox and promoters working at his direction represented to investors that PGI Global was profitably trading BTC and earning its investors enormous returns.

34.    In fact, RV Palafox did not have the expertise in the crypto asset industry he and PGI Global claimed he had.

35.    PGI Global never had an "Auto Trading" platform and was conducting little to no trading of any kind on investors' behalf.

36.    PGI Global was not licensed to deal in or trade securities or crypto assets in the Philippines, nor was it licensed to trade crypto assets in Estonia at any point during the Relevant Period.

37.    RV Palafox and PGI Global conveyed the purported returns on investors' investments on PGI Global members' "dashboards."  These dashboards were essentially electronic account statements, further described below, which falsely indicated to investors that PGI Global was successfully trading with their funds as promised.

38.    The purported profits RV Palafox and PGI Global claimed were fictitious.

39.    Purported returns reflected on investors' PGI Global dashboards misled those investors regarding the status of their investments and the success of PGI Global's trading operations generally.

40.    In certain instances, PGI Global representatives were encouraged to take screen shots of PGI Global dashboards that appeared to show purported returns on investments with PGI Global, and to share this material with prospective investors to solicit new investments in PGI Global.

41.    RV Palafox knew or was reckless in not knowing that his and PGI Global's representations regarding PGI Global's trading operations and returns on investor deposits were false.

42.    RV Palafox was meanwhile misappropriating a substantial portion of PGI Global investors' funds rather than even attempting to trade with them, and was using a substantial portion of

PGI Global investors' funds to make payments to prior investors to make it appear that PGI Global was generating profits.

43.    RV Palafox never disclosed to investors that he was misappropriating their funds or using other investors' investments to pay investors throughout the Relevant Period.

**PGI Global Investors' "Membership Packages"**

44.    RV Palafox's representations were material to investors' decisions to purchase "membership packages" in PGI Global and thus entrust their funds to RV Palafox and PGI Global to trade on their behalf.

45.    Investors purchased these membership packages by depositing certain amounts of BTC or fiat currency directly with PGI Global or via a PGI Global representative.

46.    Generally, investors purchasing a membership package would deposit their funds with PGI Global via BTC transfers to a BTC address they received from a PGI Global representative, via wire transfers to a bank account PGI Global controlled, or via cash or check payments directly to PGI Global representatives in the United States and elsewhere.  At least one PGI Global representative who promoted investment in PGI Global, directed investors' BTC transfers to the company, and personally invested in PGI Global, resided in the Eastern District of Virginia during the Relevant Period.

47.    In certain instances, PGI Global promoters in the United States purchased PGI Global membership packages on behalf of investors they had recruited.  These transactions generally involved PGI Global promoters accepting investor funds and then using the promoters' own crypto asset trading accounts to transfer BTC on the investor's behalf to crypto asset addresses PGI Global controlled.

48.    As designed by RV Palafox, PGI Global offered investors membership packages at different "levels," purporting to offer different features and benefits, depending on the amount of their investment.

49.    Among other things, PGI Global promised certain investors that within three days of their purchase of a membership package, the investor would begin receiving a daily return of .5% to

3% on their investment from PGI Global's purported crypto asset and/or Forex trading operations, with total promised returns of up to 200% per investment.

50.    Certain investors received written contracts from PGI Global guaranteeing such returns, while others relied on the representations of RV Palafox and PGI Global promoters acting at his direction, including promotional material PGI Global made available to investors online.

51.    RV Palafox and PGI Global promoters acting at his direction thus promised investors "passive" income derived solely from PGI Global's purported trading operations and the efforts of PGI Global's team, including RV Palafox himself.

52.    Such representations to prospective investors indicated that investors' deposits would be pooled by PGI Global, and that PGI Global would then trade on investors' behalf using these pooled funds.

53.    As noted above, PGI Global also maintained an online portal through which membership package holders could access personal dashboards to check the status of their investments with PGI Global.

54.    These investor dashboards purported to show PGI Global members that their investments were earning high returns, as RV Palafox and PGI Global promoters had promised.

55.    Investors relied on the "profits" reflected in their portal accounts to decide whether to continue to invest in PGI Global or to reinvest supposed profits on their initial investment, rather than attempt to withdraw their funds.

56.    RV Palafox knew or was reckless in not knowing that there were little to no profits being generated from BTC trading activity (or other activity by PGI Global) and the information reflecting "profits" on the PGI Global dashboards was false.

57.    PGI Global also offered its investors multi-level marketing style incentives for recruiting more investors to purchase membership packages.

58.    These recruiting incentives ranged from a Mont Blanc pen to automobiles and real estate.  Generally, investors were promised more valuable incentives for recruiting more new investors and/or securing larger new deposits into PGI Global.

59.    PGI Global membership package holders did not, however, receive any goods in exchange for their own investments.  Rather, purchasing a membership package merely secured an investor's position within PGI Global's multi-level marketing pyramid structure and allowed the investor to receive the purported trading returns and become eligible for the recruiting incentives PGI Global had promised.

**RV Palafox's Role in the PGI Global Scheme**

60.    Corporate records identify RV Palafox as President, Director, Treasurer, and Secretary of PGI Global during the Relevant Period.

61.    RV Palafox personally promoted investments in PGI Global and solicited investors throughout the Relevant Period.

62.    RV Palafox represented to investors and prospective investors that PGI Global was successfully earning profits from its purported trading operations during the Relevant Period.

63.    These representations attracted new investors and encouraged existing investors to reinvest their supposed profits rather than attempt to withdraw their funds, enabling the PGI Global scheme to continue.

64.    RV Palafox promoted investments in PGI Global in the United States and overseas including via Zoom presentations, solicitations on social media platforms, and in-person meetings with prospective investors.

65.    RV Palafox also personally sold PGI Global membership packages to investors.

66.    Neither RV Palafox nor any PGI Global representative working for him attempted to learn or verify the accreditation status of PGI Global's investors or prospective investors during the Relevant Period.

67.     Throughout the Relevant Period, RV Palafox knew or was reckless in not knowing that his representations to investors and prospective investors were false.

68.     RV Palafox knew or was reckless in not knowing that PGI Global was engaged in little to no actual trading in Forex or crypto assets.

69.     RV Palafox made or directed numerous BTC transactions during the Relevant Period with no apparent business purpose.

70.     In particular, RV Palafox transferred and/or directed the transfer of investors' BTC deposits between and among different crypto addresses.  Blockchain analysis revealed that these were seemingly circular transactions between clusters of crypto addresses RV Palafox controlled.

71.     Such transactions do not appear to have been in furtherance of PGI Global's purported trading operations, but rather tended to simulate such trading activity.  These transactions would thus make it appear to investors that PGI Global was buying and selling BTC to generate revenue.

72.     RV Palafox also knew or was reckless in not knowing that his representations to investors and prospective investors regarding PGI Global's operations were false because, as noted above, he was misappropriating millions of dollars in investor funds and simply redirecting millions more to prior investors in the nature of a Ponzi scheme.

73.     Throughout the Relevant Period, RV Palafox controlled PGI Global crypto asset addresses in which PGI Global pooled investors' crypto asset deposits.

74.     RV Palafox also directed PGI Global staff in their handling of investors' cash or fiat currency deposits.

75.     RV Palafox used his control over PGI Global's crypto asset addresses to misappropriate some investor funds by transferring BTC deposits from PGI Global's crypto asset addresses to a third-party money service business which converted BTC to cash.

76.     Between in or about July 2020 and in or about October 2020, for example, RV Palafox transferred over 364 BTC out of PGI Global-controlled crypto asset addresses to this third-party money service business and converted these investor deposits to approximately $3.8 million in cash.

77.     RV Palafox used this cash for his own benefit.

78.     On or about September 22, 2020, for example, RV Palafox transferred PGI Global investors' BTC deposits from a PGI Global crypto asset address to the third-party money service business referenced above in exchange for $300,000 in cash.

79.     The same day, RV Palafox purchased a Lamborghini in Las Vegas, Nevada, for approximately $300,000 in cash.

**The PGI Global Scheme Begins to Collapse**

80.     PGI Global undertook little to no legitimate trading activity, and thus never had funds commensurate with the supposed "profits" reflected in investors' member portal accounts or promised by RV Palafox and PGI Global representatives working for him.

81.     Rather, the PGI Global scheme needed funds from new investors to make even partial payments to prior investors and thus continue its operations.  RV Palafox knew or was reckless in not knowing that this was the case.

82.     Beginning in or about November 2020, at RV Palafox's direction or with his knowledge, PGI Global imposed limits on investors' accounts to prevent them from withdrawing their funds.

83.     This tactic prolonged the PGI Global scheme, because honoring withdrawal requests from investors would necessarily have accelerated the collapse of PGI Global's Ponzi-like structure.

84.     RV Palafox personally directed PGI Global staff to delay or decline payments to certain investors while authorizing transfers to certain favored individuals, and while continuing to misappropriate investor funds for himself and his family.

85.     Investors complained to RV Palafox and PGI Global representatives regarding their inability to withdraw funds from their PGI Global accounts.

86.     RV Palafox provided investors with various excuses for these delays.  Among other things, RV Palafox blamed such withdrawal delays on PGI Global's payment processor.

87.     RV Palafox knew or was reckless in not knowing that these excuses were false because, among other things, RV Palafox had personally directed PGI Global staff including Associate 1 and Associate 2 to slow or cease payments to most investors as the PGI Global scheme collapsed.

88.     By February 2021, PGI Global had largely ceased payments to investors.

**RV Palafox's Transfer of Misappropriated Funds to Third Parties—the Relief Defendants**

89.     RV Palafox directed a significant portion of PGI Global's funds to himself and certain insiders rather than attempt to repay investors, particularly toward the end of the Relevant Period.

90.     In or about June 2021, for example, Associate 1 wrote to RV Palafox that they "have to make sure you are not in any way implicated with the company because all the company [assets] related to you will be frozen."  RV Palafox responded: "All the houses and cars has [sic] to be transfer [sic] to the TRUSTS."

91.     A key vehicle for such transfers was Relief Defendant BBMR.

92.     RV Palafox directed Associate 1 and Associate 2 to create BBMR for the purpose of holding assets purchased with misappropriated investor funds, and/or funds derived from the sale of assets that had been purchased with misappropriated investor funds.

93.     BBMR was accordingly formed at RV Palafox's direction on or about June 14, 2021, with close relatives of RV Palafox—Associate 1 and Associate 2—as co-managers.

94.     RV Palafox subsequently transferred or directed the transfer of assets purchased with PGI Global investor funds, or of cash derived from the sale of assets purchased with PGI Global investor funds, to BBMR through and beyond the end of the Relevant Period.

95.     RV Palafox transferred or directed the transfer of certain assets to BBMR in anticipation of PGI Global's collapse as, contrary to his representations to investors, he knew PGI Global did not have the funds to repay investors.

96.     RV Palafox and Marissa Palafox purchased real property and various other things of value with PGI Global investor funds during the Relevant Period.

97.     For example, RV Palafox purchased his personal residence during the Relevant Period with approximately $1.7 million of PGI Global investor funds.

98.     RV Palafox subsequently conveyed this residence to BBMR on or about August 23, 2021.

99.     RV Palafox also transferred hundreds of thousands of dollars to BBMR in funds derived from the sale of assets purchased with PGI Global investor funds.

100.    In total, BBMR received approximately $777,000 in cash derived from the sale of assets purchased with PGI Global investor funds.  RV Palafox also conveyed or directed the conveyance to BBMR of real estate purchased for his benefit with over $4.9 million in PGI Global investor funds.  BBMR provided no services to PGI Global and had no legitimate claim to any such real property purchased with PGI Global investor funds, or funds derived from the sale of assets purchased with PGI Global investor funds.

101.    Throughout the Relevant Period, RV Palafox also transferred or approved the transfer of PGI Global investor funds and/or assets derived from PGI Global investor funds to Relief Defendants Darvie Mendoza, Marissa Mendoza Palafox, and Linda Ventura for which they provided no services and had no legitimate claim.  These Relief Defendants were unjustly enriched through the receipt of these funds and/or assets.

102.    Darvie Mendoza is RV Palafox's brother-in-law.  He received $22,500 in gross salary payments from PGI Global between April and August of 2021.  However, Darvie Mendoza also received payments derived from PGI Global investor funds unrelated to any work or services he

performed for PGI Global, including a $320,212 mortgage payment authorized by RV Palafox.  Darvie Mendoza had no legitimate claim to the $320,212 mortgage payment he received.

103.    Relief Defendants Marissa Mendoza Palafox and Linda Ventura never worked for or provided services to PGI Global in consideration for the funds and assets they received from RV Palafox and PGI Global, which were derived from PGI Global investor funds.

104.    Relief Defendant Linda Ventura—who is RV Palafox's mother—nevertheless received cash and gifts derived from PGI Global investor funds including a mortgage payment of approximately $169,252 and a Range Rover vehicle.  Linda Ventura had no legitimate claim to this cash or these gifts.

105.    Relief Defendant Marissa Mendoza Palafox—who is RV Palafox's wife—also benefitted from PGI Global investor funds.  Among other things, Marissa Mendoza Palafox received items paid for with PGI Global investor funds including over $1.18 million in Cartier jewelry and purchases at luxury retailers including Nordstrom, Neiman-Marcus, Tiffany & Co., Louis Vuitton, Christian Dior, Chanel and Hermes totaling approximately $88,000.  Marissa Mendoza Palafox had no legitimate claim to these items paid for with PGI Global investor funds.

**The End of PGI Global**

106.    PGI Global's website went offline in or about June of 2021.

107.    On or about July 14, 2021, RV Palafox released a statement in which he falsely represented that PGI Global was not closing and the company would satisfy its obligations to repay investors.

108.    Rather than repay investors as promised, however, RV Palafox continued his efforts to transfer assets purchased with investor funds to third parties such as Relief Defendant BBMR.

109.    RV Palafox resigned as chief executive officer of PGI Global in September 2021.

110.    He did not relinquish control over PGI Global's accounts, however, and efforts to re-launch the company under new leadership failed.

111.    On or about September 16, 2021, the Philippines Securities and Exchange Commission issued a fraud alert warning investors not to invest or to stop investing in PGI Global.

112.    In or about October 2021, the U.S. Internal Revenue Service seized PGI Global's website.  The company ceased efforts to solicit new investors after this seizure.

113.    By the end of the Relevant Period, RV Palafox had misappropriated approximately $57 million of PGI Global investor funds.

114.    RV Palafox's unauthorized uses of these funds included buying real estate worth millions of dollars along with various other high-value purchases.

115.    For example, by the end of the Relevant Period, RV Palafox had spent over $340,000 of PGI Global investor funds on watches, and approximately $3.4 million on automobiles.

## PGI GLOBAL'S MEMBERSHIP PACKAGES WERE SECURITIES

116.    PGI Global's membership packages were investment contracts and thus constituted securities within the meaning of Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.  As investment contracts, PGI Global's membership packages involved: (1) the investment of money; (2) in a common enterprise; (3) with a reasonable expectation of profits to be derived from the efforts of others.  *See SEC v. W.J. Howey Co.*, 328 U.S. 298-99 (1946).

117.    PGI Global offered and sold membership packages in exchange for fiat currency and BTC, as alleged above.

118.    Investors purchasing PGI Global membership packages invested in a "common enterprise."  PGI Global pooled investors' funds, and PGI Global's membership package holders were promised returns in proportion to the size of their investment.

119.    RV Palafox and PGI Global led investors to expect that they would receive profits on their membership package investments through the efforts of third parties trading on their behalf, including RV Palafox's purported trading team.  PGI Global and RV Palafox promised through promotional materials and other representations to investors and prospective investors that PGI

Global's membership package holders would receive passive income on their investments derived from crypto asset and/or Forex trading.  Membership package holders could also earn additional incentives, as described above, by recruiting others to invest in PGI Global.  However, all PGI Global membership package holders were promised returns on their investments even if they remained entirely passive and only participated in PGI Global by investing their funds with the company.

### RV PALAFOX OFFERED AND SOLD UNREGISTERED SECURITIES

120.    Sections 5(a) and 5(c) of the Securities Act require issuers to register the offer or sale of securities with the Commission.  These provisions also prohibit individuals from engaging in unregistered offers or sales of securities.

121.    No registration statement was in effect, nor had PGI Global filed such a registration statement, concerning PGI Global and RV Palafox's offer or sale of securities in the form of PGI Global membership packages.

122.    RV Palafox, directly or indirectly, sold or offered PGI Global membership packages through the use of interstate facilities or the mails and interstate commerce.

123.    RV Palafox's offers and sales of PGI Global membership packages did not qualify for an exemption from registration.

124.    RV Palafox violated Section 5 by promoting and selling PGI Global membership packages to investors in the manner alleged above.  Among other things, RV Palafox founded and led PGI Global, featured prominently in PGI Global promotional materials, and appeared at PGI Global promotional events in person and electronically via Zoom and other media to recruit investors.

**RV PALAFOX VIOLATED ANTIFRAUD PROVISIONS OF FEDERAL SECURITIES LAWS**

125.    RV Palafox knew, or was reckless in not knowing, that PGI Global never generated returns sufficient to meet its payment obligations to investors.

126.    RV Palafox knew, or was reckless in not knowing, that nearly all of PGI Global's revenue during the Relevant Period came from sales of new PGI Global membership packages rather than Forex or crypto asset trading.

127.    RV Palafox knew, or was reckless in not knowing, that PGI Global could not reasonably expect to generate the returns it promised to investors.

128.    RV Palafox was the architect and public face of the PGI Global scheme.  He founded the company, led it throughout the Relevant Period, and personally promoted investment in PGI Global.

129.    PGI Global and RV Palafox touted RV Palafox's supposed expertise in crypto asset trading to induce investors to entrust PGI Global with their funds.  RV Palafox also made representations to investors, as described above, regarding PGI Global's "Auto Trading" platform and the success of its trading operations.

130.    RV Palafox knew, or was reckless in not knowing, that his statements regarding PGI Global's trading operations and his own crypto asset trading expertise were materially false and misleading.  RV Palafox also knew, or was reckless in not knowing, that he was in fact operating a scheme to defraud investors who purchased PGI Global membership packages.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

131.    The Commission re-alleges and incorporates by reference paragraphs 1 through 130.

132.    By engaging in the conduct described above, Defendant, in connection with the purchase or sale of securities, directly or indirectly, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly or

recklessly: (1) employed one or more devices, schemes, or artifices to defraud; (2) made one or more untrue statements of material fact or omitted to state one or more material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

133.    Defendant thus violated, and unless restrained and enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act

134.    The Commission re-alleges and incorporates by reference paragraphs 1 through 130.

135.    By engaging in the conduct described above, Defendant, in the offer or sale of securities, directly or indirectly, by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails: (1) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud; (2) knowingly, recklessly, or negligently obtained money by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) knowingly, recklessly, or negligently engaged in one or more transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

136.    Defendant thus violated, and unless restrained and enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF
### Violations of Sections 5(a) and (c) of the Securities Act

137.    The Commission re-alleges and incorporates by reference paragraphs 1 through 130.

138.    By engaging in the conduct described above, Defendant, directly or indirectly: (1) made use of the means or instruments of transportation or communication in interstate commerce or of the

mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no

registration statement has been in effect and for which no exemption from registration has been

available; and/or (2) made use of the means or instruments of transportation or communication in

interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or

otherwise, securities as to which no registration statement has been filed, for which no exemption from

registration has been available.

139.    Defendant thus violated, and unless restrained and enjoined will again violate, Sections

5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(All Relief Defendants)**

140.    The Commission re-alleges and incorporates by reference paragraphs 1 through 130.

141.    During the Relevant Period, Relief Defendant BBMR received assets derived from PGI

Global investor funds and proceeds from the sale of such assets.  BBMR had no legitimate claim to the

money or assets it received.  BBMR obtained these funds and assets under circumstances in which it is

not just, equitable, or conscionable for it to retain them, and therefore was unjustly enriched.

142.    During the Relevant Period, Relief Defendant Darvie Mendoza received cash payments

and other financial benefits from PGI Global derived from PGI Global investor funds.  Darvie

Mendoza had no legitimate claim to certain funds he received from PGI Global.  Darvie Mendoza

obtained these funds under circumstances in which it is not just, equitable, or conscionable for him to

retain the funds, and therefore was unjustly enriched.

143.    During the Relevant Period, Relief Defendant Marissa Mendoza Palafox received PGI

Global investor funds and assets derived from PGI Global investor funds.  Marissa Mendoza Palafox

had no legitimate claim to the investor funds and assets derived from investor funds which she

received during the Relevant Period.  Marissa Mendoza Palafox obtained these funds under

circumstances in which it is not just, equitable, or conscionable for her to retain the funds, and therefore was unjustly enriched.

144.    During the Relevant Period, Relief Defendant Linda Ventura received funds and gifts from RV Palafox derived from PGI Global investor funds. Linda Ventura had no legitimate claim to the investor funds and assets derived from investor funds which she received during the Relevant Period. Linda Ventura obtained these funds and items under circumstances in which it is not just, equitable, or conscionable for her to retain them, and therefore was unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendant from violating Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a) and (c), 77q(a)], as well as Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### II.

Permanently enjoining Defendant, including but not limited to through any entity Defendant owns or controls, from: (1) offering, operating, or participating in any marketing or sales program involving the issuance, purchase, offer, or sale of securities in which the participant is compensated or promised compensation solely or primarily for (a) inducing another person to become a participant in the program; or (b) if such induced person induces another to become a participant in the program; and (2) participating, directly, or indirectly, in any issuance, purchase, offer, or sale of any crypto asset bought or sold as a security, provided, however, that such injunction shall not prevent Defendant from purchasing or selling crypto assets sold as securities for Defendant's own personal accounts.

### III.

Ordering Defendant to disgorge all ill-gotten gains received directly or indirectly, with prejudgment interest thereon, as a result of the conduct this Complaint alleges, pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and (d)(7)].

### IV.

Ordering Defendant to pay civil monetary penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### V.

Ordering Relief Defendants to pay, with prejudgment interest, all ill-gotten gains by which they were unjustly enriched pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and (d)(7)].

## VI.

Granting such other and further relief as the Court may deem just and appropriate.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Commission requests that

this case be tried to a jury.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

Dated:  Apr. 22, 2025

By:  */s/ Eugene N. Hansen*
Eugene N. Hansen (VSB No. 48357)
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-5985
Tel:  (202) 551-6091
Fax: (202) 772-9292
Email:  HansenE@sec.gov

Scott A. Thompson
Gregory R. Bockin
Spencer Willig
Assunta Vivolo
Polly A. Hayes
Securities and Exchange Commission
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
Tel:  (215) 597-3100
Email: WilligS@sec.gov

*Attorneys for Plaintiff*